AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

FILED _____ LODGED
_____ RECEIVED

**AUG 25 2017**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

|  |  |  |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  MJ17-5137 |
| iPhone Cellular Phone with Target Telephone Number 360-591-1088 | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A, which is attached hereto and incorporated herein by this reference.

located in the _____ **Western** _____ District of _____ **Washington** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, which is attached hereto and incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841 and 846 | Drug Trafficking |
| 18 U.S.C. 1343 and 1346 | Honest Services Fraud |
| 18 U.S.C. 242 | Deprivation of Civil Rights |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Richard C. Schroff
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 08/25/2017 _____

_____
*Judge's signature*

City and state: **TACOMA, WASHINGTON**     HON. David. W. Christel, U.S. MAGISTRATE JUDGE
*Printed name and title*

2016R00334

1         **AFFIDAVIT OF SPECIAL AGENT RICHARD C. SCHROFF**

2

3 STATE OF WASHINGTON     )

4                           )     ss
    COUNTY OF PIERCE         )

5

6     I, Richard C. Schroff, being first duly sworn on oath, depose and say:

7                           **INTRODUCTION**

8     1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI),

9 and have been employed as a criminal investigator with the FBI since July of 2014. I am

10 a graduate of the FBI Academy in Quantico, Virginia and have attended various other

11 trainings such as the U.S. Department of Justice, Asset Forfeiture/Money Laundering

12 Section's Basic Financial Investigation Seminar and a seminar on public corruption lead

13 by the FBI's Public Corruption Unit. The FBI is responsible for enforcing federal

14 criminal statutes of the United States. While employed by the FBI, I have investigated

15 violent crime, cases of child exploitation, violations involving controlled substances, and

16 other criminal matters which can generally be referred to as white collar crime. I have

17 gained experience through training and everyday work relating to conducting these types

18 of investigations. As a case agent, I have been assigned to lead an Organized Crime Drug

19 Enforcement Task Force (OCDETF) focused on a cartel affiliated drug trafficking

20 organization and have also investigated individual drug dealers responsible for

21 distributing various controlled substances in Indian Country. I am currently assigned to

22 investigate matters involving public corruption. As a federal law enforcement officer

23 engaged in enforcing the criminal laws of the United States, I am authorized by the

24 Attorney General to request search warrants.

25     2.     The FBI is conducting an investigation concerning Charles Andrew

26 STOCKER, a Corrections Officer formerly employed with the City of Aberdeen,

27 Washington. As part of the initial investigation, STOCKER was charged by complaint

28 on February 22, 2017 with two counts of Aiding and Abetting Drug Trafficking in

1  violation of 18 U.S.C. § 2 and two counts of Misprision of Felony in violation of 18
2  U.S.C. § 4 for providing information pertaining to law enforcement operations to those
3  involved in drug trafficking and failing to report that drug trafficking to the appropriate
4  authorities.  He was subsequently indicted on March 15, 2017 on all four counts.  In
5  connection with this portion of the investigation, the FBI obtained a search warrant that
6  authorized the seizure and search of STOCKER's mobile telephone, which is an iPhone,
7  for evidence of any communication STOCKER may have had with those involved in
8  drug trafficking, as more fully described in attachment B and below.  As set forth more
9  fully below, at the time the prior search warrant was authorized, the FBI did not possess
10 the technology to unlock STOCKER's locked telephone.  The FBI now possesses the
11 technology to unlock the phone.  Therefore, I am requesting that the Court issue another
12 search warrant to search the phone for evidence sought pursuant the previously issued
13 warrant.
14        3.     In addition, the FBI's continuing investigation has developed information
15 that while employed as a corrections officer, STOCKER engaged in sexual contact with
16 various female prisoners that were under his direct supervision.  In exchange for the
17 sexual contact, it appears that STOCKER gave these female prisoners benefits such as:
18 (1) providing coffee, ice cream, fast food, and non-prescription medications; (2) releasing
19 prisoners from jail early or releasing them on a furlough; and (3) not reporting to the
20 Washington Department of Corrections (DOC) that a prisoner was in custody while there
21 was a DOC warrant for her arrest.
22        4.     The facts set forth in this Affidavit are based on my own personal
23 knowledge; knowledge obtained from other individuals during my participation in this
24 investigation, including other law enforcement officers; interviews of witnesses; my
25 review of records related to this investigation; communications with others who have
26 knowledge of the events and circumstances described herein; and information gained
27 through my training and experience.  Because this Affidavit is submitted for the limited
28 purpose of establishing probable cause in support of the application for a search warrant,

1  it does not set forth each and every fact that I or others have learned during the course of

2  this investigation.  I have set forth only the facts that I believe are relevant to the

3  determination of probable cause to believe STOCKER has committed the crimes of Drug

4  Trafficking in violation of Title 21, United States Code, Sections 841(a)(1) and 846;

5  Honest Services Fraud, in violation of Title 18, United States Code, Section 1343 and

6  1346; and Deprivation of Civil Rights, in violation of Title 18, United States Code,

7  Section 242, and that evidence, fruits, and instrumentalities of those offenses will be

8  found stored on the STOCKER'S iPhone, which was assigned the phone number 360-

9  591-1088 at the time of its seizure, (hereinafter the "SUBJECT DEVICE").  The

10  SUBJECT DEVICE has been in FBI secure evidence storage located in Seattle,

11  Washington since its seizure on July 20, 2016 pursuant to a warrant issued by the

12  Honorable J. Richard Creatura.

13          5.      Given the technological difficulties in unlocking the password-protected

14  iPhone, the FBI was unable to search the seized SUBJECT DEVICE at that time for

15  evidence sought by the warrant previously issued by Magistrate Judge Creatura.  As set

16  forth more fully below, the FBI now has the technological capabilities to search the

17  SUBJECT DEVICE for relevant evidence.  However, since a significant period has

18  passed since the SUBJECT DEVICE was seized, I am requesting a new search warrant to

19  search for the evidence listed in Attachment B to the warrant issued by Magistrate Judge

20  Creatura (the "Drug Trafficking Evidence").  In addition, further investigation has

21  revealed that probable cause exists to believe that STOCKER committed the crimes of

22  Honest Services Fraud, in violation of Title 18, United States Code, Section 1343 and

23  1346, and Civil Rights offenses, in violation of Title 18, United States Code, Section 242,

24  involving exchanging benefits with an inmate for sexual favors, and that evidence of such

25  misconduct is on the SUBJECT DEVICE.

26                                **BACKGROUND**

27

28          6.      On June 20, 2016, the FBI seized the SUBJECT DEVICE pursuant to a

search warrant issued by Magistrate Judge Creatura.  A copy of that warrant, along with

AFFIDAVIT OF RICHARD C. SCHROFF - 3

1 | the affidavit submitted in support of its application, is attached to this affidavit and

2 | application for a search warrant as Exhibit 1, and incorporated herein.

3 |      7.     After seizing the SUBJECT DEVICE, FBI Agents sought to search it for

4 | evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846

5 | pursuant to Attachment B of the previously issued warrant.  See Exhibit 1, Attachment B.

6 | However, FBI Agents were unable to search SUBJECT DEVICE because they did not

7 | have the password required to login to the SUBJECT DEVICE and, at the time, did not

8 | have other technological means to gain access to the SUBJECT DEVICE.  Since its

9 | seizure, the SUBJECT DEVICE has been powered off and in airplane mode while stored

10 | in the FBI's secure evidence storage facility in Seattle, Washington.  As a result, it is not

11 | possible for anyone to have accessed or changed its contents remotely and therefore the

12 | contents of the SUBJECT DEVICE will be as they were at the time of seizure.  As a

13 | further result of how it has been stored, the SUBJECT DEVICE will not have undergone

14 | periodic software updates, which means it will be running the same type and version of

15 | the operating system as it was at the time of seizure.

16 |      8.     In May 2017, I consulted with experts at the FBI's Operational Technology

17 | Division, which oversees various programs involving the exploitation of digital devices

18 | such as SUBJECT DEVICE.  I was made aware that the FBI was in the process of

19 | obtaining new software which would allow access to devices of the same make and

20 | model as SUBJECT DEVICE which are running the same version of the operating

21 | system which SUBJECT DEVICE is likely to be running, based off of when it was seized

22 | and placed into airplane mode.  It is likely that this new software will allow Agents to

23 | access SUBJECT DEVICE in order to search it for the items described in Attachment B

24 | of this affidavit, which includes: (1) the evidence sought by the previous search warrant;

25 | and (2) evidence relating to additional crimes the FBI has continued to investigate after

26 | the seizure of the SUBJECT DEVICE.

27

28

AFFIDAVIT OF RICHARD C. SCHROFF - 4

**LEGAL PROVISIONS**

9.     Title 18, United States Code, Sections 1343 and 1346 make it a crime for a public official to devise a scheme or artifice to deprive the public of its intangible right of honest services by engaging in bribery and kickback schemes.  The elements of honest services fraud are:

a.     First, the defendant devised or participated in a scheme to defraud the public of his or her honest services through bribery or in exchange for kickbacks;

b.     Second, the defendant owed a fiduciary duty to the defrauded public;

c.     Third, the defendant acted knowingly and with an intent to defraud;

d.     Fourth, the defendant made a material misrepresentation or concealment of fact in furtherance of the scheme to defraud;

e.     Fifth, the defendant transmitted or caused to be transmitted, any writing signal, or sound by means of a wire communication in interstate commerce that advanced the scheme.

A public official, like STOCKER, is "guilty of honest-services fraud if he accepts something of value in exchange for an official act." *United States v. Renzi*, 769 F.3d 731, 744.  The Supreme Court has specifically stated that the honest-services fraud statute "draws content … from" the federal bribery statute, *United States v. Skilling*, 561 U.S. 358, 412-13 (2010), which describes bribery as involving "anything of value." 18 U.S.C. § 201(b)(1).  In the Ninth Circuit, the "'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'" *Renzi*, 769 F.3d at 744 (quoting *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986).   The Second Circuit has stated "sexual intercourse, or the promise of sexual intercourse, is a thing of value under a bribery statute." *United States v. Girard*, 601 F.2d 69, 71 (2nd Cir. 1979).  Furthermore, the Fifth Circuit has expressly held that "furnishing sexual services provides a 'thing of value' sufficient to constitute bribery" for purposes of the honest services fraud statute. *United States v. Barraza*, 655 F.3d 375, 383-84 (5th Cir. 2011).

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

10.  Title 18, United States Code, Section 242, prohibits individuals, acting under the color of law from depriving others of rights secured by the Constitution or laws of the United States.  The elements of 18 U.S.C. § 242 are:

a.  First, the defendant was acting under color of law when he committed the alleged acts;

b.  Second, the defendant deprived an individual of a right secured by the Constitution or laws of the United States;

c.  Third, the defendant acted willfully, that is the defendant acted with a bad purpose, intending to deprive the individual of the right.

"Sexual harassment or abuse of an inmate by a corrections officer is a violation of the Eighth Amendment." *Wood v. Beauclair*, 692 F.3d 1041, 1049 (9th Cir. 2012) (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000)).  *See also Schwenk*, 204 F.3d at 1197 (stating that "[i]n the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse [is] unquestionably clearly established … and no reasonable prison guard could possibly [believe] otherwise").  In the Ninth Circuit, consensual sexual contact between inmates and guards likely is not sexual abuse under the Eighth Amendment.  However, if the sexual contact is coercive, it may rise to a violation of the Eighth Amendment.  *Wood*, 692 F.3d at 1048-49.  In *Wood*, the Ninth Circuit held that "explicit assertions or manifestations of non-consent indicate coercion, *but so too may favors, privileges, or any type of exchange for sex.*" *Id.*, at 1049 (emphasis added).

In addition, a prison guard may violate an inmate's Eighth Amendment rights by acting with deliberate indifference in withholding adequate medical care to address the inmate's serious medical needs.  *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Hudson v. McMillian*, 502 U.S. 1, 9 (1992).

**PROBABLE CAUSE**

11.  As noted above, the FBI was previously unable to search the SUBJECT DEVICE because it was password protected and the FBI lacked the technological means to unlock the SUBJECT DEVICE to execute the search warrant.  As the FBI now has that

AFFIDAVIT OF RICHARD C. SCHROFF - 6

1 | ability, I am requesting that the Court issue another search warrant based upon the
2 | previous probable cause as described in Exhibit 1.

3 |     12.     In addition, in my continuing investigation, I learned from witness and
4 | victim interviews that STOCKER used or attempted to use the SUBJECT DEVICE to
5 | communicate with women that he victimized or attempted to victimize while working as
6 | a corrections officer at the Aberdeen City Jail (ACJ).  Witnesses also told me that
7 | STOCKER used the SUBJECT DEVICE to document, by photographing and/or video
8 | recording, his actions inside ACJ that may be abusive or exploitative behavior towards
9 | inmates.  A witness also indicated that STOCKER may have used the device to document
10 | by photographing and/or video recording an encounter with a female who was a potential
11 | victim.

12 |     13.     On July 20, 2016, during an FBI led operation that included the execution
13 | of the search warrant that led to the seizure of SUBJECT DEVICE, I interviewed
14 | STOCKER.  Among other things, STOCKER told me and other law enforcement officers
15 | the following:

16 |     • He had the same phone number for 20-25 years and that number is posted
17 |        on his Facebook page.
18 |     • In the past, he has had criminals call him, though he claimed to have never
19 |        given any inmates his personal phone number which was associated with
20 |        SUBJECT DEVICE at time of seizure.
21 |     • He never talked to any former female inmate on the phone with the
22 |        exception of one, whom he named and said he spoke with three years ago.
23 |     • A female inmate, hereinafter referred to as Victim 1, called STOCKER at
24 |        jail one time when he was working but never called aside from that
25 |        occasion.
26 |     • He never had a romantic relationship with female prisoners inside or
27 |        outside of jail, though he was accused of having one involving an incident
28 |        in a laundry room, which he said was not true.

AFFIDAVIT OF RICHARD C. SCHROFF - 7

1      14.    I interviewed Victim 1 on May 5, 2017, May 10, 2017, and August 17,

2 2017. Victim 1 is a female who was addicted to heroin and worked as a prostitute in the

3 city of Aberdeen, Washington. She has an extensive criminal history and was booked

4 into ACJ approximately 16 times between 2010 and 2016, a portion of which she was

5 under STOCKER's supervision.

6      15.    Victim 1 reported that she first met STOCKER through her boyfriend, who

7 used to work for STOCKER as a porter when he was incarcerated at the Washington

8 Department of Correction's Stafford Creek Correction Center where STOCKER

9 previously worked. STOCKER told Victim 1 that if she ever needed anything, she

10 should come and see him while he was working at ACJ. According to Victim 1, she later

11 needed some money and came to see STOCKER at the ACJ. STOCKER had previously

12 told her which shifts he was working and that when she came to see him she should call

13 the phone outside of the jail and say that she needed to bring a hygiene item to an inmate.

14 Victim 1, who was out of custody at the time, did as directed, and STOCKER then let

15 Victim 1 in through a door of the Aberdeen Police Department (APD). Once she was

16 inside, STOCKER directed Victim 1 to an office within the APD. Victim 1 asked for

17 money, and STOCKER began unbuckling his belt and told her that the money would not

18 be free. Victim 1 understood that this meant STOCKER sought to have a sexual

19 encounter with her. Victim 1 did not want to have a sexual encounter with STOCKER.

20 She came up with an excuse and ran from the jail with STOCKER chasing after her

21 before a friend picked her up. According to Victim 1, she was very scared by this event

22 and believed STOCKER might seek retribution, such as having a warrant entered for her

23 arrest.

24      16.    Sometime later, Victim 1 was arrested and began serving time in the ACJ.

25 She was sick because she was experiencing withdrawal from not being able to use heroin.

26 When STOCKER was on shift, Victim 1 approached STOCKER and told him, in sum

27 and substance, that she was ready to do what she had to do, meaning she was ready to

28 provide sexual contact to STOCKER. STOCKER agreed and thus allowed Victim 1 to

AFFIDAVIT OF RICHARD C. SCHROFF - 8

1   serve as a trustee, which meant she would be allowed out of the female jail cells for the

2   purpose of cleaning portions of ACJ and performing other chores at the direction of the

3   corrections officer on duty, and provided other privileges to her.  Victim 1 said that she

4   knew STOCKER wanted to have a sexual encounter with her based off her previous

5   experience with him.  At some point in time, STOCKER then took Victim 1 to the

6   laundry room in the ACJ where Victim 1 performed oral sex on STOCKER.  According

7   to a number of victims and witnesses, Stocker chose the laundry room because it is not

8   covered by video surveillance.  After the sexual contact began, STOCKER continued to

9   make Victim 1 a trustee and provided her with Nyquil, coffee, or sugar, though she was

10  unable to remember which item STOCKER provided on this first occasion.  Victim 1

11  said STOCKER had led her to believe that he would get her heroin or a prescription drug

12  used to treat heroin in exchange for sexual favors, though he never actually provided the

13  drugs.

14       17.    Victim 1 said she and STOCKER continued to exchange sexual contact

15  between the approximate dates of 2010 and 2016.  She told me that it was never a "tit-

16  for-tat" relationship, where she provided a specific sexual service for a specific item or

17  benefit, but rather a general and standing agreement and understanding between them that

18  she would provide sexual services to him and, in exchange, he would provide her with

19  privileges and favors.  She estimated that during this time period, she had a sexual

20  encounter with STOCKER 10 to 15 times while a prisoner in ACJ, 10 to 15 times inside

21  of the APD but not while serving a jail sentence at ACJ, and 10 times outside of the ACJ

22  or APD in the shop belonging to STOCKER's side business.  All of the sexual encounters

23  included oral sex, with the exception of two, which Victim 1 said included vaginal sex.

24  Victim 1 benefited from this exchange by obtaining fast food, NyQuil, freedom of

25  movement as a trustee, small amounts of money when outside the jail, and on one notable

26  occasion, clean needles in order to inject heroin.  Also, Victim 1 has claimed that she

27  benefitted by not having to serve all of her jail time.  For example, she said that she knew

28  there were occasions where she had an outstanding warrant from DOC but was not

AFFIDAVIT OF RICHARD C. SCHROFF - 9

1  arrested on those warrants. STOCKER told her that he would not call DOC to report that
2  she was in custody. As a result, her supervising DOC officer could not ensure she was
3  taken into custody by DOC, thus allowing her to avoid additional jail time. Victim 1 also
4  said that STOCKER would also release her early from ACJ for good behavior or said he
5  would talk to the Aberdeen City Prosecutor to help with her charges.

6       18.     While she benefitted from the sexual encounters, Victim 1 was also afraid
7  of retribution if she did not engage in sexual contact with STOCKER. She explained that
8  STOCKER had seen her use heroin in ACJ and she was afraid he could get her into
9  trouble as a result. Further, she said that STOCKER, while in uniform and driving an
10 APD vehicle, would come and find her while she was out in public and working as a
11 prostitute. He would sometimes ask her if she had a DOC warrant, which she often did,
12 and then ask her to meet him at his shop. She was afraid that if she did not meet him for
13 a sexual encounter at his shop, he would have her arrested on her DOC warrant.

14      19.     Victim 1 thought she attempted to communicate with STOCKER via phone
15 several times. She said she used another person's cell phone to call STOCKER at ACJ
16 and she received back-to-back phone calls from a restricted phone number in 2012 that
17 she believed could have been from Stocker. She said Stocker only tried to call her at the
18 very beginning of their sexual interactions. When he called her, the caller ID said
19 "anonymous." She also believed she sent him a message on Facebook but did not think
20 he replied to her. On August 17, 2017, I searched Victim 1's Facebook messages with
21 her consent and was unable to locate any messages sent between STOCKER and Victim
22 1.

23      20.     On August 22, 2016 and again on May 24, 2017, I interviewed Victim 2
24 whom STOCKER had made sexual advances towards while she was a prisoner at ACJ.
25 Victim 2 made her initial complaint and was interviewed by FBI Special Agent Jeff
26 Stetler on June 28, 2016. Victim 2 served jail time in ACJ in approximately 2014 or
27 2015 for shoplifting. While in ACJ and under STOCKER's supervision, STOCKER
28 transported Victim 2 to the Aberdeen Municipal Courthouse. While in court, Victim 2

1   was looking around, and she made eye contact with STOCKER when STOCKER

2   mouthed the words, "when are we going to fuck", and made the motion of thrusting his

3   pelvis towards her. According to Victim 2, during her hearing, the judge told Victim 2

4   she was to be released at 6 a.m. the next morning. Victim 2 repeatedly asked another

5   ACJ corrections officer to be released early so she could avoid further contact with

6   STOCKER.

7        21.    The next day, STOCKER arrived to release Victim 2 from the ACJ. When

8   he walked her out, STOCKER asked Victim 2 what the term "Respect" meant. Victim 2

9   knew that STOCKER had been through her phone without her permission because

10   Victim 2 had photographs on her phone depicting her nude. Victim 2 has a tattoo of the

11   word "Respect" directly above her vagina. STOCKER then told her something to the

12   effect of, "I want to put my face down there and do it for hours." He also told her that he

13   had done things like this before, but that she was the only decent looking girl coming

14   through the ACJ. He told her that they could go into the laundry room and have sex, and

15   that he had previously brought other women in there. STOCKER told Victim 2 that he

16   wanted her to call him and gave her his phone number. Victim 2 felt that STOCKER was

17   really pressuring her to call him and get together with him for a sexual encounter. Victim

18   2 reported that after her encounter with STOCKER, she felt violated and disrespected,

19   and suffered anxiety around law enforcement. Across her three interviews, Victim 2

20   provided a consistent account of what occurred between her and STOCKER.

21        22.    On May 31, 2017, I interviewed another female inmate, hereinafter referred

22   to as Victim 3, who STOCKER victimized. Victim 3 also witnessed STOCKER's

23   victimization of another woman who was an inmate under his custody, hereinafter

24   referred to as Victim 4. Victim 3 was a heroin addict and working in the City of

25   Aberdeen, Washington as a prostitute. She was booked into ACJ approximately twenty

26   times between 2010 and 2015 when she was incarcerated by the State of Washington.

27   Victim 3 stated that her victimization included three incidents where STOCKER

28   attempted to have Victim 3 reveal parts of her body to him. In the first incident,

AFFIDAVIT OF RICHARD C. SCHROFF - 11

1  STOCKER stood in the door to a cell where Victim 3 was changing from her street

2  clothes to jail clothes while being booked into ACJ.  STOCKER refused to leave the

3  room and allow Victim 3 to change in privacy.  Victim 3 said it was common practice to

4  close a screen on the door so women could change in privacy.  STOCKER told Victim 3

5  that he would have the other women come in, tie her down, and undress her if she would

6  not do it herself.  Victim 3 eventually changed clothes underneath her street cloths.  She

7  said that after her refusal to change in front of him, STOCKER called her a "dirty bitch."

8      23.    In the second incident, STOCKER booked Victim 3 into the ACJ.  She

9  requested a medium uniform.  STOCKER told her she was looking thin and gave her a

10  small uniform.  STOCKER then told Victim 3 he needed to see her breasts and if she

11  showed them to him, he would make sure she was released from ACJ after having served

12  only half of the time to which she was sentenced.  He also offered her coffee, candy, and

13  other such items.  Victim 3 refused these items and served her full four-day sentence.

14  Following her refusal, STOCKER put Victim 3 into an individual cell and withheld food

15  from her, telling her she had no right to eat there, leaving her with only a small cup of

16  water.  After two days in a cell by herself, Victim 3 asked another officer to consult the

17  logbook and see why she was in an individual cell.  The officer told her it was marked

18  down that she was uncooperative during booking and then moved her to the communal

19  women's cell.

20      24.    During the third incident, STOCKER pressed his body closely against the

21  backside of Victim 3's body while fingerprinting her.  She said that she had often been

22  fingerprinted, but had never been fingerprinted like that, in ACJ or any other facility, and

23  felt uncomfortable with the way STOCKER touched her.

24      25.    During the interview, Victim 3 told me that she knew Victim 1, and she and

25  Victim 1 had twice been prisoners together inside ACJ, though never when STOCKER

26  was working.  Victim 1 had told Victim 3 she was having a sexual relationship with

27  STOCKER.  Victim 3 also knew of Victim 4 and had personal knowledge her and

28  STOCKER having a sexual relationship.  During either 2009 or 2010, but possibly later,

AFFIDAVIT OF RICHARD C. SCHROFF - 12

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1   Victim 3 and Victim 4 were booked into ACJ together when STOCKER was working as
2   the corrections officer on duty.  She said that Victim 4 had previously told her that she
3   was in a sexual relationship with STOCKER and seeing them together in person it did
4   indeed appear that they were in a relationship together as they were flirtatious.  On this
5   occasion, STOCKER selected Victim 4 to be trustee for the day and removed her from
6   the communal women's cell.  Victim 3 later observed the door to the laundry room closed
7   and heard giggling noises coming from inside.  Stocker then exited the laundry room and
8   locked the inner door to the women's cell, making it so that Victim 3 could no longer see
9   the door or hear the giggling noises.  Approximately twenty minutes later, Victim 4
10  returned to the women's cell.  She told Victim 3 that she just had sex with STOCKER
11  and used a rubber glove as a condom.  Shortly afterwards, STOCKER brought all the
12  women Baskin Robbins ice cream.  Victim 3 said that Victim 4 was able to get whatever
13  she wanted while in jail, including ice cream, heroin, and needles.  Outside of jail, Victim
14  3 said that Victim 4 and STOCKER's relationship was ongoing.  She was present when
15  Victim 4 used a prepaid cellphone to call STOCKER and was told by Victim 4 that she
16  was calling STOCKER.  On another occasion, Victim 4 took Victim 3 to a park.  There
17  she met STOCKER inside an SUV.  Victim 3 never saw STOCKER but Victim 4 said
18  she had met with STOCKER.  Victim 4 returned with $800 or $900, which Victim 3
19  thought was paid to Victim 4 to not tell anyone about her and STOCKER's relationship.

20      26.    On August 8, 2017, I interviewed Victim 4. Victim 4 said she did tell
21  Victim 3 about Victim 4's sexual relationship with STOCKER, but that Victim 3 was not
22  present in the jail when it happened.  She further denied having brought Victim 3 to any
23  meeting with STOCKER or having received money from STOCKER.

24      27.    Victim 4 stated that she had been in ACJ on four occasions when
25  STOCKER was working as a corrections officer and that he made no sexual advances
26  towards her nor did they have any sexual contact.  On her fifth time in ACJ when
27  STOCKER was working, she was supposed to serve seven days.  During the first few
28  days, she was experiencing withdrawal from her heroin addiction and feeling sick.  She

AFFIDAVIT OF RICHARD C. SCHROFF - 13

1   said that STOCKER provided her with ice cream and pizza, allowed her to take smoke

2   breaks outside of ACJ, and allowed her to work as a trustee.  Victim 4 said that she felt

3   like she received privileges that were not afforded to other female inmates. Victim 4

4   thought that STOCKER was being kind and helping her through withdrawals but also

5   speculated that he may have wanted a sexual relationship with her.  On or about the sixth

6   day of her imprisonment, while STOCKER was on duty, Victim 4 was taking a break

7   from doing laundry and smoking a cigarette outside of ACJ.  When coming back into the

8   jail, STOCKER caught Victim 4 sneaking a cigarette into the jail and said something to

9   the effect of, "I may have to frisk you," to which Victim 4 said something to the effect of,

10  "you might."  STOCKER then followed Victim 4 back to the laundry room, which at the

11  time had no video cameras.  Once inside, Victim 4 told me he pulled down Victim 4's

12  pants and began "fingering" her, which I understood to mean he penetrated her vagina

13  with his finger.  STOCKER then guided Victim 4's head down to his penis and she

14  performed oral sex on him.  STOCKER then reached for a latex glove and suggested that

15  he use it as a condom.  Victim 4 instead told him to retrieve a condom from her personal

16  property, which he did.  The two then had sex which Victim 4 described as discreet and

17  fast.  Following intercourse, STOCKER directed Victim 4 to shower and wash her

18  clothes and his uniform so there would be no DNA.

19      28.     Victim 4 said that her having sex with STOCKER was consensual and that

20  he did not force her to do it. She said that it was exciting and like a real life pornography

21  film, and that she hoped to make her boyfriend, who had been unfaithful to her, jealous.

22      29.     Victim 4 said that following the above sexual encounter, STOCKER would

23  have her "flash" him by motioning to her to lift up her shirt, which she would then do to

24  display her breasts for him.  Victim 4 was transported to Gray's Harbor County Jail

25  following the end of her sentence in ACJ.  She said that her only additional encounters

26  with STOCKER were approximately a year and a half following her sexual encounter

27  when she went to court in Aberdeen.  She said STOCKER then pinched her buttocks and

28  mouthed to her something about their experience in the laundry room.  Victim 4 said that

AFFIDAVIT OF RICHARD C. SCHROFF - 14

1   STOCKER did give her a ride in his car several times when he saw her out on the street.

2   She said that STOCKER wanted to have a sexual encounter with her when he gave her

3   these rides but that she was either unable or unwilling to.  She also reported calling

4   STOCKER twice on the APD jail phone.

5        30.    Once she had been transported to Gray's Harbor County Jail following her

6   seven-day imprisonment, Victim 4 told Victim 3 about her sexual encounter with

7   STOCKER.  Victim 3 then reported Victim 4's encounter with STOCKER to Gray's

8   Harbor County Jail staff as though she had been present in ACJ and a witness to Victim

9   4's encounters with STOCKER.  According to Victim 4, Victim 3 told the staff because

10  Victim 3 was jealous that Victim 3 did not receive preferential treatment in the ACJ.

11       31.    Following Victim 3's reporting of Victim 4's sexual relationship with

12  STOCKER, the Gray's Harbor County Sheriff's Office conducted a criminal

13  investigation.  During the investigation, Victim 4 reported to the detective conducting the

14  investigation that she did have a sexual encounter with STOCKER, though STOCKER

15  denied the allegations.  Investigators found, and Victim 4 reported during her interview

16  with me, that Victim 3 was not a prisoner in the jail when the sexual encounter between

17  STOCKER and Victim 4 was alleged to have happened.  As a result of this, and a lack of

18  other witnesses, no criminal charges were filed against STOCKER.

19       32.    Victim 4 also told me that she was friends with Victim 1 and was dating

20  Victim 1's brother.  In approximately 2014 and 2015, Victim 4 said that she would be

21  with Victim 1 when Victim 1 would call STOCKER from her cellphone.  Victim 1 would

22  then go meet STOCKER in the lobby of ACJ and return with money.  Victim 4 did not

23  hear what Victim 1 and STOCKER discussed during the phone calls and did not know

24  what phone numbers STOCKER or Victim 1 used.  Victim 4 did say Victim 1 told her

25  that she was engaged in a sexual relationship with STOCKER and would receive money

26  in exchange for those sex acts.

27       33.    Victim 1 also told me that she was aware of Victim 4's sexual relationship

28  with STOCKER.  Because of their friendship and connection through Victim 1's brother,

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1 │ Victim 4 had discussed the sexual encounter she had with STOCKER with Victim 1.

2 │ Victim 1 stated during interview on August 17, 2017 that STOCKER approached her

3 │ during the above mentioned investigation into STOCKER and Victim 4's relationship,

4 │ and asked her and her boyfriend at the time to ensure Victim 4 did not talk to law

5 │ enforcement or to testify about Victim 4 and his relationship.

6 │ **Witnesses**

7 │     34.    On March 30, 2017 and on April 27, 2017, I interviewed a woman

8 │ (hereinafter, Witness 1) who witnessed STOCKER's relationship with Victim 1. Witness

9 │ 1 said she was friends with Victim 1. In the course of their friendship, Victim 1 told

10 │ Witness 1 that she was in a sexual relationship with STOCKER and receiving preferential

11 │ treatment and benefits, such as reduced jail time, from him in exchange for participation

12 │ in their sexual relationship. Witness 1 said that at some point in approximately 2012, she

13 │ smuggled heroin into ACJ. She and the other women in ACJ wanted to inject the heroin

14 │ instead of inhaling it. Victim 1 said she would ask STOCKER for needles which were

15 │ typically used to inject insulin. Witness 1 then heard Victim 1 converse with STOCKER

16 │ about the needles before she returned with them. Victim 1 told Witness 1 that

17 │ STOCKER had placed the needles in a trashcan and then given the trashcan to Victim 1

18 │ so that the women could inject the heroin. This was corroborated by Victim 1 during our

19 │ interviews.

20 │     35.    Witness 1 said that she knew Victim 1 had communicated on the phone

21 │ with STOCKER as she had been present when Victim 1 called STOCKER. Witness 1

22 │ also knew and was friends with Victim 3. Witness 1 also said Victim 4 told her she had

23 │ sex with STOCKER in the laundry room in order to be released early from jail.

24 │     36.    On July 28, 2016 and September 19, 2016, I interviewed Aaron Glanz, one

25 │ of STOCKER's former business partners at Coastal Printworks, concerning STOCKER's

26 │ business affairs, involvement with individuals engaged in drug trafficking, and his

27 │ relationships with women whom he had supervised as a corrections officer at the ACJ.

28 │ Glanz told me STOCKER took videos using his cell phone of inmates in the Aberdeen

1  City Jail who were having psychological or other disturbed episodes.  In these videos,
2  STOCKER would encourage the individual having the episode and record it.  STOCKER
3  would then show these videos to friends as a joke.  Glanz said he never knew of any
4  videos to contain nudity or sexual acts.  Glanz told me during a follow up interview on
5  August 11, 2017 that STOCKER showed him two of the videos, which he had stored on
6  his cell phone that he normally kept with him.  The first video shows a man inside the
7  cell, who was "tweaking out", which I understand from my training and experience to
8  mean that he was agitated and acting erratically from having used some type of illegal
9  drug, typically methamphetamine.  Glanz could not recall what STOCKER said to the
10  man on the video, but STOCKER spoke to him in a condescending manner in a way that
11  seemed as though STOCKER intended to escalate the situation and "get a rise" out of the
12  man in the cell.
13      37.   In the second video, which STOCKER showed Glanz after the above-
14  described video and at some point in approximately late 2015 or early 2016, STOCKER
15  showed similar antagonizing behavior toward a female inmate.  The video showed the
16  female inmate sitting alone and on the floor inside of a jail cell.  She was "babbling" and
17  sitting beside vomit, which appeared to be her own.  Glanz told me that STOCKER said
18  something to the effect of, "you better clean that shit up" to the woman in an
19  antagonizing, facetious manner, as though he was bullying her.  It also appeared as
20  though the woman asked STOCKER for something.  Glanz could not remember exactly
21  what she asked for, but used as an example that she had asked for some water.
22  STOCKER replied with the same bulling tone something to the effect of, "aww, you want
23  some water?"
24      38.   During the investigation, the FBI learned that in 2015, a female inmate sued
25  STOCKER and the City of Aberdeen for civil rights violations.  The female inmate
26  alleged that STOCKER failed to provide the woman with adequate medical care.  During
27  the investigation, I obtained records relating to the lawsuit from the woman's attorney.
28  Those materials, including still photos of the video recordings, show the woman lying on

1   a bed in the women's cell with a trail of dark brown vomit extending to the drain in the

2   middle of the cell.  Given Glanz's statements, I believe that the video on STOCKER's

3   phone may reflect this incident.  In fact, Glanz told me that STOCKER insinuated,

4   sometime after having shown Glanz that video, that there was a lawsuit over "the girl that

5   had thrown up."

6        39.    Glanz also told me about a conversation he had with Jeff Timmons. J.

7   Timmons was STOCKER's friend of and used to work at the Department of Corrections

8   Facility at Stafford Creek with STOCKER.   J. Timmons told Glanz of a conversation he

9   had with STOCKER following the searches performed by law enforcement at his home

10   and at Coastal Printworks.  According to Glanz, STOCKER told J. Timmons he was very

11   worried about what the FBI would find on SUBJECT DEVICE.   He told him there was

12   something on his phone that was "not good" and involved a girl who was "bad" and

13   occurred inside Coastal Printworks.  STOCKER told J. Timmons the girl had never been

14   in jail before.

15        40.    Steve Timmons, a police officer in the City of Aberdeen and STOCKER's

16   other business partner at Coastal Printworks, knew of a time when STOCKER hired a girl

17   named          , whom S. Timmons knew to be a prostitute, to clean inside the

18   business.  Glanz and S. Timmons speculated that this may be the girl that STOCKER was

19   referring to in his conversation with J. Timmons.

20        41.    On September 23, 2016, another Agent and I interviewed J. Timmons.  J.

21   Timmons confirmed that STOCKER had told him about being worried about what the

22   FBI would find on SUBJECT DEVICE, as he had something on it involving a girl that

23   was "bad," but whom had never been in jail before.  J. Timmons also told me that he

24   knew of Stocker having videos he had made of prisoners who were upset or having a

25   psychiatric episode and shown them to people while at a bar-b-que, though he knew of

26   none which involved sexual conduct.

27

28

AFFIDAVIT OF RICHARD C. SCHROFF - 18

1

# CONCLUSION

2      Based on the foregoing, I believe there is probable cause that evidence, fruits, and

3 instrumentalities of violations of Honest Services Fraud, in violation of Title 18, United

4 States Code, Section 1343 and 1346, and Civil Rights offenses, in violation of Title 18,

5 United States Code, Section 242, are located on the SUBJECT DEVICE, as more fully

6 described in Attachment A to this Affidavit.  Further, I believe there is probable cause

7 that evidence, fruits, and instrumentalities of violations of Conspiracy to Distribute

8 Controlled Substances and Distribution of Controlled Substances, in violation of Title 21,

9 United States Code, Sections 841 and 846, as further described in Exhibit 1.  I therefore

10 request that the Court issue a warrant authorizing a search of the SUBJECT DEVICE for

11 the items more fully described in Attachment B hereto, incorporated herein by reference,

12 and the seizure of any such items found therein.

13      Dated this 25 day of August, 2017.

14

15

16

17      Special Agent Richard C. Schroff
       Federal Bureau of Investigation

18

19

20 Subscribed and sworn to before me this 25th day of August, 2017.

21

22

23

24 The Honorable David W. Christel
   United States Magistrate Judge

25

26

27

28

AFFIDAVIT OF RICHARD C. SCHROFF - 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A**
**DESCRIPTION OF ITEMS TO BE SEARCHED**

1) SUBJECT DEVICE: STOCKER'S iPhone which was assigned number 360-591-1088 at the time of its seizure on July 20, 2017 and was taken from the possession of STOCKER. The phone is currently located in an FBI secure evidence storage facility located in Seattle, WA.

ATTACHMENT A

## ATTACHMENT B
## ITEMS TO BE SEIZED

The items to be seized are the following items or materials that may contain evidence of the commission of, the fruits of, or property which has been used as the means of committing federal criminal violations of Conspiracy to Distribute Controlled Substances and Distribution of Controlled Substances, in violation of Title 21, United States Code, Sections 841 and 846; Honest Services Fraud, in violation of Title 18, United States Code, Section 1343 and 1346; and Deprivation of Civil Rights, in violation of Title 18, United States Code, Section 242:

From 2010 to the present, all data included in the memory of the SUBJECT DEVICE which may tend to show identity, location, purpose, plan or knowledge of any person, organization, or personal association of STOCKER with:

    a.   drug trafficking activities,

    b.   the exchange of sexual activity for benefits in prison, and/or

    c.   the deprivation of an inmate's civil rights within a prison facility

which may include photographs and/or videos; telephone directories, address books, or any other type of communication contact lists; content of e-mails, text messages, voice mail, or any other type of electronic correspondence; and evidence of phone calls, text messages, and any other electronic correspondence such as communications logs which may be stored on the SUBJECT DEVICE.

ATTACHMENT B - 1

# EXHIBIT 1

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

## for the
### Western District of Washington

FILED _____ LODGED
_____ RECEIVED

**JUL 19 2016**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                              DEPUTY

In the Matter of the Search of                )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Target Telephone 360-591-1088; Any safe at the Subject )
Residence; Any safe located at Coastal Print Works. )
see Attachment A for further details          )

Case No.   MJ 16-5140

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is attached hereto and incorporated herein by this reference.

located in the _____ **Western** _____ District of _____ **Washington** _____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-1, which is attached hereto and incorporated herein by this reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| Title 21, U.S.C. § 841(a)(1) | Distribution of Controlled Substances |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SPECIAL AGENT RICHARD C. SCHROFF, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   7/19/16

City and state:  TACOMA, WASHINGTON

_____
*Judge's signature*

HON. J. Richard Creatura, U.S. MAGISTRATE JUDGE
*Printed name and title*

2016R00334

**AFFIDAVIT OF SPECIAL AGENT RICHARD C. SCHROFF**

STATE OF WASHINGTON    )
                               )    ss
COUNTY OF PIERCE         )

I, Richard C. Schroff, being first duly sworn on oath, depose and say:

## INTRODUCTION

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been employed as a criminal investigator with the FBI since July of 2014. I am a graduate of the FBI Academy in Quantico, Virginia and have attended various other trainings such as the U.S. Department of Justice, Asset Forfeiture/Money Laundering Section's Basic Financial Investigation Seminar. The FBI is responsible for enforcing federal criminal statutes of the United States. While employed by the FBI, I have investigated violent crime, cases of child exploitation, violations involving controlled substances, and other criminal matters which can generally be referred to as white collar crime. I have gained experience through training and everyday work relating to conducting these types of investigations. As a case agent, I have been assigned to lead an Organized Crime Drug Enforcement Task Force (OCDETF) focused on a cartel affiliated drug trafficking organization and have also investigated individual drug dealers responsible for distributing various controlled substances in Indian Country. As a federal law enforcement officer engaged in enforcing the criminal laws of the United States, I am authorized by the Attorney General to request search warrants.

2.     The FBI is conducting an investigation concerning Charles Andrew STOCKER, a Corrections Officer employed with the City of Aberdeen, Washington. During the course of the investigation, I have learned that Charles STOCKER has formed a relationship with Charles Daniel BOWMAN, a methamphetamine dealer in Aberdeen and Hoquiam, Washington. The investigation has revealed that STOCKER provides

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1   BOWMAN and others with law enforcement information and other support in
2   furtherance of their criminal activity.

3       3.    The facts set forth in this Affidavit are based on my own personal
4   knowledge; knowledge obtained from other individuals during my participation in this
5   investigation, including other law enforcement officers; interviews of witnesses; my
6   review of records related to this investigation; communications with others who have
7   knowledge of the events and circumstances described herein; and information gained
8   through my training and experience. Because this Affidavit is submitted for the limited
9   purpose of establishing probable cause in support of the application for a search warrant,
10   it does not set forth each and every fact that I or others have learned during the course of
11   this investigation. I have set forth only the facts that I believe are relevant to the
12   determination of probable cause to believe STOCKER has committed violations of 21
13   U.S.C. § 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances) and that
14   evidence, fruits, and instrumentalities of that offense will be found in the following:

15       a.    STOCKER'S cellular telephone which is currently assigned number
16   360-591-1088 (hereinafter the "Target Telephone"), with service provided by Verizon;

17       b.    Any safe located at Coastal Print Works, 110 E. Wishkah Street,
18   Aberdeen, Washington

19       c.    Any safe located at STOCKER's residence, at 115 Florence Lane,
20   Cosmopolis, Washington (hereinafter, Subject Residence).

21           **SUMMARY OF INVESTIGATION**

22       1.    The Gray's Harbor Drug Task Force (the "Task Force") is currently
23   conducting an investigation into drug trafficking in Aberdeen, Washington, by a number
24   of individuals, including Lindsey SPARGO and her boyfriend, Charles aka "Daniel"
25   BOWMAN.

26       2.    BOWMAN has seven felony convictions and 13 misdemeanor convictions,
27   all of which were adjudicated in a Washington State or municipal Court. His felony
28   convictions occurred between 1998 and 2012 and include possession of stolen property,

AFFIDAVIT OF RICHARD C. SCHROFF - 2

1   possession of a controlled substance with no prescription, escape, forgery, burglary, theft,

2   and residential burglary.  His misdemeanor convictions include numerous counts of

3   driving with a suspended license, one count of obstructing a law enforcement officer, one

4   count of driving under the influence, and one count of false reporting of an emergency.

5   BOWMAN currently has charges pending against him, with a trial set for October 2016

6   for unlawful firearm possession, three counts of possession of a controlled substance, and

7   attempt to elude.

8          3.      As part of the Gray's Harbor Drug Task Force investigation, Detective

9   Kevin Schrader was told in three separate interviews to be careful about sharing

10  information with law enforcement personnel not involved with the Task Force.  Various

11  interviewees informed Detective Schrader that STOCKER was sharing sensitive law

12  enforcement information with certain individuals who were not law enforcement who had

13  no valid purpose for receiving such information.  Over time, the Task Force saw several

14  examples of this occur and affect their operations.

15         4.      For example, according to the Task Force, an individual who was arrested

16  in the fall of 2015 had agreed to become an informant for the Task Force.  Before the

17  informant was able to cooperate proactively, the informant was immediately cut off from

18  his drug supply, believed to be SPARGO, and was unable to purchase drugs from his

19  supplier.

20         5.      In March 2016, Detective Schrader was monitoring phone calls made from

21  the Gray's Harbor County Jail to SPARGO as part of the Task Force's investigation.  On

22  February 17, 2016, a phone call was made by Josh McMANUS, a prisoner at Gray's

23  Harbor County Jail, to SPARGO's telephone number – 360-591-4835.  According to

24  Detective Schrader, BOWMAN answered the phone call.  In the phone call, BOWMAN

25  told McMANUS that a "mutual friend" from Aberdeen wanted BOWMAN to tell

26  McMANUS that another individual ("Informant A") was planning to do a controlled

27  purchase of drugs from McMANUS.  BOWMAN also told McMANUS that the person

28  BOWMAN received the information from is 100 percent reliable.  BOWMAN concluded

AFFIDAVIT OF RICHARD C. SCHROFF - 3

1  the call by telling McMANUS that the two could discuss the matter further in person

2  after McMANUS was released from the jail the following day.  BOWMAN also gave

3  McMANUS his telephone number – 360-580-0820.

4      6.   According to the Task Force, at the time of the call between McMANUS

5  and BOWMAN, the Task Force was indeed planning to use Informant A to purchase

6  drugs from McMANUS.  According to Detective Schrader, in January 2016, Informant A

7  called Detective Schrader using the Aberdeen City Jail telephone after being arrested for

8  shoplifting.  During the call, STOCKER took the phone from Informant A, and told

9  Detective Schrader that the purpose of the call was not to call Detective Schrader and

10  apologized.  Thus, STOCKER knew of Informant A's attempt to contact Detective

11  Schrader.

12      7.   In June 2016, Sergeant Joe Strong, the supervisor of the Task Force, and I

13  had the opportunity to interview another informant (Informant B) who was working for

14  the Task Force.  Informant B said they were present when McMANUS discussed how

15  STOCKER had told him that Informant A was an informant working for the Task Force

16  and intending to conduct controlled drug purchases from McMANUS.  Informant B said

17  McMANUS claimed to have told STOCKER that he would prevent the sale of heroin to

18  STOCKER's son in exchange for STOCKER's assistance and information.  Further,

19  Informant B informed me that two individuals sought retribution against Informant A for

20  his affiliation with law enforcement by attempting to run him off the road and physically

21  assaulting him on several occasions.

22      8.   On January 30, 2016, Detective Schrader listened to a telephone call from

23  the Aberdeen City Jail from BOWMAN to SPARGO.  In the call, BOWMAN discussed

24  missing a court appearance, and asked SPARGO if she had called STOCKER.  SPARGO

25  said she had not.

26      9.   Detective Schrader reviewed the Gray's Harbor County's listing of

27  employee emergency contact telephone numbers and found that the Target Telephone is

28  listed as STOCKER's emergency contact telephone number.

AFFIDAVIT OF RICHARD C. SCHROFF - 4

1     10.    During its investigation, the Task Force received telephone toll records for

2  BOWMAN's telephone number between February 9, 2016, and March 10, 2016. The toll

3  records indicate that BOWMAN and the Target Telephone had 31 contacts, including

4  phone calls and text messages, in the one-month period.

5     11.    After being made aware of the relationship between STOCKER and

6  BOWMAN, being informed of STOCKER providing information concerning upcoming

7  law enforcement operations to McMANUS to thwart the Task Force's investigation, and

8  receiving other allegations of misconduct by STOCKER, I opened an investigation

9  concerning STOCKER's misconduct. As part of that investigation and in working with

10  the U.S. Attorney's Office in the Western District of Washington, the U.S. Attorney's

11  Office applied for and received approval from the U.S. District Court for the Western

12  District of Washington (16MJ-115) to install a pen register and trap and trace device on

13  the phone number associated with the Target Phone and in use by STOCKER.

14     12.    In the course of initiating my investigation, I determined where STOCKER

15  lived and his places of business (other than the Aberdeen City Police Department). A

16  search of Washington State Department of Licensing records for STOCKER's name

17  revealed that he was the registered owner of a White 2013 Toyota Tacoma with

18  Washington plate B94174X which was registered to Subject Residence. A search of the

19  subscription information database CLEAR showed several possible addresses for

20  STOCKER, but listed the Subject Residence as a location where utility service had been

21  established in STOCKER's name and listed STOCKER as the owner of Subject

22  Residence in tax records for the County of Gray's Harbor in the 2015 tax year. I also

23  conducted surveillance at Subject Residence. No vehicles were present at the time and a

24  more detailed description can be found in Attachment A.

25     13.    CLEAR also listed Coastal Print Works, located at 110 E. Wishkah Street,

26  Aberdeen, Washington, as a business affiliation of STOCKER and listed him as an

27  officer and the registered agent. I conducted surveillance of this location and observed a

28  white Toyota Tacoma Pickup truck with a license plate ending in 174X. I also observed

AFFIDAVIT OF RICHARD C. SCHROFF - 5

1  an adult male in front of the store whom I recognized to be STOCKER from his WA
2  DOL photograph.

3      14.    The records obtained from the installation of the pen register and trap and
4  trace device indicated that STOCKER and BOWMAN continued periodic
5  communication with one another. Information obtained pursuant to the order authorizing
6  the pen register and trap and trace device indicted that BOWMAN and STOCKER
7  communicated with one another on 14 occasions.

8      15.    A large number of subscriber records obtained pursuant to that order were
9  businesses with which STOCKER associated in the course of operating Coastal Print
10 Works. However there were also a number of records which reflected contact between
11 STOCKER and others.  Members of the Task Force were asked to review some of the
12 subscriber records which were obtained through that order.  In their review, they
13 identified several individuals who had been in contact with STOCKER that they had
14 come to know through the course of their work with the Task Force and whom they
15 believed had no legitimate purpose to be in contact with a corrections officer employed
16 by a law enforcement agency.

17     16.    On July 8, 2016, BOWMAN was pulled over by the Hoquiam Police
18 Department and placed under arrest by members of Task Force based on probable cause
19 for violations of various drug offenses under the Revised Code of Washington.  The
20 probable cause had been developed in previous law enforcement operations where
21 Confidential Informants (CI) acting for the Task Force had purchased methamphetamine
22 from BOWMAN.  The vehicle driven by BOWMAN was searched by members of the
23 Task Force after obtaining his written consent.  During the search, approximately five
24 and a half ounces of methamphetamine was discovered in a bag, along with a pistol.

25     17.    After his arrest, BOWMAN was interviewed by members of the Task
26 Force, a Special Agent from the Drug Enforcement Administration (DEA), and myself.
27 Prior to interview, Sgt. Strong advised BOWMAN of his rights.  BOWMAN signed the
28 presented advice of rights form acknowledging that he understood those rights and

AFFIDAVIT OF RICHARD C. SCHROFF - 6

1  wished to speak with the law enforcement officers.  In the interview that followed,

2  BOWMAN provided the history of his relationship with STOCKER.

3      18.    According to BOWMAN, the two met when BOWMAN was booked into

4  the Aberdeen City Jail in early fall 2015, when BOWMAN served a four-month prison

5  sentence for driving with a suspended license.  During the four months, BOWMAN and

6  STOCKER formed a friendship which resulted in STOCKER providing certain favors to

7  BOWMAN. These favors included the following:

8        a.    During September 2015, Stocker was walking BOWMAN from a

9  court appearance back to the Aberdeen City Jail (ACJ).  During the walk, he told

10  BOWMAN that the Task Force was listening to his phone calls and that the other

11  individual currently booked in ACJ was providing the Task Force with information about

12  BOWMAN.

13        b.    On one occasion, STOCKER told BOWMAN that he could get him

14  out of jail and on a furlough if he faked a heart attack.  BOWMAN did fake a heart attack

15  and Stocker did release him on a furlough for the purpose of seeking medical treatment.

16        c.    During one of the furloughs, BOWMAN called STOCKER and

17  asked if STOCKER had heard anything about him.  STOCKER informed him that either

18  the Task Force or members of Washington State Department of Corrections had been

19  asking about him.

20        d.    While BOWMAN was serving his time at ACJ, STOCKER offered

21  to hold onto some money for him.  STOCKER told BOWMAN that he would store the

22  money in a safe until BOWMAN wanted it back.  STOCKER also told Bowman that

23  BOWMAN could just throw it in the back of STOCKER'S truck for him to retrieve.

24      19.    During the interview, BOWMAN said that he and STOCKER continued

25  their relationship once he had been released from ACJ in January 2016.  BOWMAN said

26  he would occasionally call STOCKER just to say hello and talk, and on occasion,

27  STOCKER would call him. During these calls, BOWMAN said he sometimes asked

28  STOCKER if he had heard anything that prisoners or law enforcement was saying about

AFFIDAVIT OF RICHARD C. SCHROFF - 7

1   him, and STOCKER would tell him, "things he heard in the loop." BOWMAN said that

2   he thinks he requested information like this from STOCKER on five to ten occasions.

3       20.    BOWMAN said that on one occasion, in or around March 2016,

4   STOCKER called him and asked that he get a message to McMANUS, which

5   BOWMAN agreed to do. STOCKER told BOWMAN that Informant A was working for

6   the Task Force and planning on doing controlled drug buys from McManus. STOCKER

7   told BOWMAN he wanted BOWMAN to warn McManus so he could avoid selling drugs

8   to Informant A. This information is consistent with what members of the Task Force

9   described during their review of jail calls and their interview with Informant B as

10  described in paragraphs 5 and 6 of this affidavit.

11      21.    After being interviewed, I asked BOWMAN if he was willing to call

12  STOCKER and ask him to hold onto money for him. BOWMAN indicated that he was

13  and signed an FBI form FD-472 providing his permission to record that phone call.

14  BOWMAN then contacted STOCKER by calling the phone number associated with the

15  Target Telephone. STOCKER answered the phone and said that he was currently at

16  work. I knew STOCKER to be working at ACJ, as I had previously received his work

17  schedule from the Aberdeen City Police Department. During the phone call, BOWMAN

18  asked STOCKER if he remembered that he had previously offered to hold onto

19  something for him. STOCKER said that he did, and BOWMAN then asked STOCKER

20  if he would be willing to hold onto some money for him. STOCKER agreed and

21  BOWMAN asked how he could get the money to STOCKER. STOCKER said he would

22  need to call him back later. This conversation was captured on two recording devices in

23  use by the FBI.

24      22.    Later on the evening of July 8, 2016, STOCKER called BOWMAN from

25  the Target Telephone. At my direction, BOWMAN did not answer the phone call. In

26  subsequent text messages the two agreed to speak a short time later that evening. A short

27  time later BOWMAN called the Target Telephone and STOCKER answered the phone.

28  STOCKER said that he wanted to discuss BOWMAN's request in person, not over the

AFFIDAVIT OF RICHARD C. SCHROFF - 8

1 telephone.  STOCKER said that he was still at work but that BOWMAN could stop by
2 ACJ to discuss the request or wait until STOCKER left work at 11 p.m. that night.
3 Bowman later informed STOCKER by text message that he would not be able to meet
4 that night but would get in touch with him again soon.

5     23.    On July 11, 2016, members of the Task Force and myself met again with
6 BOWMAN.  BOWMAN said STOCKER had tried to call him over the weekend but that
7 he had not answered his phone.  BOWMAN agreed to meet with STOCKER in person to
8 discuss STOCKER holding money for BOWMAN and record their meeting.

9     24.    That day, BOWMAN met with STOCKER at STOCKER's business,
10 Coastal Print Works. This conversation was recorded by the FBI with the consent of
11 BOWMAN using equipment provided by the FBI and worn on BOWMAN's person.
12 During the conversation, BOWMAN explained to STOCKER that he had been pulled
13 over and arrested on Friday, July 8, 2016.  While discussing BOWMAN's traffic stop, a
14 portion of the conversation went as follows:

15     **STOCKER:** The day you called me, people were calling looking for you.
16     **BOWMAN:** Yeah…
17     **STOCKER:** Lots of people, I mean, it's like, "hey you got BOWMAN in
18     custody?" No, why?

19     25.    BOWMAN and STOCKER then discussed a previous incident where
20 BOWMAN was arrested and released without charges.  BOWMAN told Stocker that the
21 July 8, 2016 arrest was like an incident last year where he was pulled over and arrested
22 with a woman and then released without any paperwork.  Bowman said in that incident,
23 "I had….whatever was in the console, you know what I mean?"  The conversation then
24 continued with the following:

25     **STOCKER:** So, if you, if you think you're going to be going away?
26     **BOWMAN:** Well, I'm thinking something is going to happen, so…
27     **STOCKER:** Like I said, I don't want to know. I don't want to know nothing. Just,
28     if you want me to hold something for you, I'll probably do it. I'll put it in my safe

1 at home. It's safe. And, uh, I mean, I guess I can find out how much time you get
2 through your girl.
3     **BOWMAN:** Yeah, well yeah, yeah she would know. Right, I mean, yeah yeah
4     she'll know...
5     26.    BOWMAN and STOCKER then discussed whether or not BOWMAN
6 should tell his girlfriend, SPARGO, about the money he would be leaving with
7 STOCKER or not. BOWMAN said that he would not want SPARGO going to
8 STOCKER for money and would not want STOCKER providing the money to anyone
9 without BOWMAN's permission. STOCKER shows concern that his holding the money
10 for BOWMAN could be used against him in the following exchange:
11     **STOCKER:** I'm just saying, say for instance you were to want me hold a bunch
12     of money and then she would come to me and say, "Hey. I want a thousand
13     bucks," and I'm like, hmm Fuck you..
14     **BOWMAN:** Yeah no
15     **STOCKER:** Would it be best just not to even fucking tell her that way that she
16     can't use it against me and go either give me the thousand dollars...
17     **BOWMAN:** yeah or I'm gunna fucking...
18     **STOCKER:** yeah you see what I'm saying?
19     **BOWMAN:** yeah
20     27.    BOWMAN and STOCKER then decided that SPARGO should not know
21 STOCKER is holding the money and go on to further discuss the logistics of how
22 STOCKER will receive and store the money. STOCKER said, "What I could do is, I
23 could take that money, say it is, I'll seal it and it just remains sealed and, I'll ter [sic]…
24 I'll, I'll put it in the safe and…it's gone." The two also discussed what will be done if
25 something happened to STOCKER like getting into a car accident. Bowman tells
26 STOCKER that the amount of money he will hold onto will probably be at least $10,000,
27 to which STOCKER replied, "That's nothing." STOCKER then said that he has that
28 much money there in his office safe. He then told BOWMAN, "that's my safe," and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1 "I've got a safe inside that safe…" They discussed BOWMAN buying a briefcase safe
2 that he could put the money into or a fireproof lockbox.

3     28.    After discussing STOCKER's potential to hold money for BOWMAN,
4 BOWMAN asked "you haven't heard anything have you? Anything about, nothing going
5 around the fucking…?" STOCKER said that he has not but it has been busy, "down
6 there." In my training and experience, I believe STOCKER was referencing the
7 Aberdeen Jail. STOCKER said he has been on vacation and has an additional period of
8 vacation coming up but he has not heard anything about BOWMAN. STOCKER then
9 went on to say that the Task Force has been really busy lately doing controlled buys but
10 they do not tell him anything. STOCKER also said there is an informant that meets with
11 a member of the Task Force who parks his/her car in the rear of the Aberdeen Police
12 Station, but STOCKER does not know who the informant is. BOWMAN then says, "I
13 mean, you just gotta assume that everyone is a fucking…" to which STOCKER interrupts
14 by saying, "yeah, you do! You really do. They'll sell you all out."

15     29.    BOWMAN and STOCKER continue to make small talk for a brief period
16 of time before beginning to end the conversation as follows:

17     **STOCKER:** Yeah so just let me know

18     **BOWMAN:** Yeah, yeah, it'll probably be…

19     **STOCKER:** …like I said what I would probably do is you just leave me that and

20     I'll have the instructions if something happens to me, then it, it goes.

21     **BOWMAN:** Ok

22     **STOCKER:** But

23     **BOWMAN:** Yeah…[mumbling]…I mean I'm not just going to bring it in here in

24     a fucking…yeah just bring it in? Ok

25     **STOCKER:** Yeah, call me before you do it

26     **BOWMAN:** Right

27     **STOCKER:** Then, ya know, I can…I can put it.

28     **BOWMAN:** yeah

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1    **STOCKER:** Then I can put it in there.

2    **BOWMAN:** Yeah ok

3    **STOCKER:** Just, ya know, whatever…whatever you're going to have in there I

4    don't care. Whatever, I don't really want to know. I mean, if you want me to have

5    the combination or a key to it let me know, and then ya know 'cause if someone

6    needs, if you're gonna…

7    **BOWMAN:** Yeah

8    **STOCKER:** Should there be a reason to take money out of it? Not really?

9        30.    The two then briefly discuss the potential for BOWMAN's child to have

10   access to the money, but BOWMAN explains that he will try to set it up so that is not

11   necessary. On the recording, I heard BOWMAN stand and begin walking. There is then

12   some small talk before BOWMAN departs Coastal Print Works. I observed BOWMAN

13   exit Coastal Print Works and depart the area in his vehicle at approximately 5:06pm.

14       31.    In my investigation, I obtained and reviewed account information for

15   STOCKER's personal checking and savings accounts as well as the checking and savings

16   accounts for Coastal Print Works. STOCKER has established checking and savings

17   accounts with Twinstar Credit Union which he holds jointly with his wife. In my review

18   of STOCKER's checking account for the months of January through March 2016, the

19   ending account balance ranged from $2,332 to $2,828. During that time period, the only

20   large deposits were direct deposits made from the City of Aberdeen for STOCKER's

21   salary and from Cosmopolis Schools, which I believe to be salary payments for

22   STOCKER's spouse. The total per month deposits for these payments was

23   approximately $6,200. For the months reviewed, there were no checks written to cash,

24   and no large Automated Teller Machine (ATM) withdrawals, and only one significant

25   cash deposit of $700 in the month of January.

26       32.    My review of the checking account for Coastal Print Works for the months

27   of January through March of 2016 showed the following activity:

28   /

AFFIDAVIT OF RICHARD C. SCHROFF - 12

| Month | Account | Deposits | Withdrawals/Checks | End Balance |
|-------|---------|----------|--------------------|-------------|
| January | Saving | $1,613 | $1,609 | $64 |
| | Checking | $8,431 | $8,766 | $1,163 |
| February | Saving | $2,346 | $0 | $2,411 |
| | Checking | $12,498 | $11,940 | $1,721 |
| March | Saving | $8,105 | $7,910 | $2,607 |
| | Checking | $28,566 | $28,111 | $2,175 |

During this time period, there were no cash withdrawals. No checks were written to cash. There were two significant cash deposits made to the checking account in the month of February 2016 in the amount of $800 and $840.

## SUMMARY OF PROBABLE CAUSE

33.     I believe there is probable cause to search and seize the Target Telephone as the facts set forth in this affidavit show that it has consistently been used by STOCKER to communicate with BOWMAN, whom STOCKER knows to be involved with the distribution of illegal drugs.  In their communications, STOCKER has shared privileged law enforcement information with BOWMAN.  I believe the purpose of sharing this privileged information is to aid BOWMAN, McMANUS, SPARGO, and likely others in avoiding detection and arrest at the hands of the Task Force or other law enforcement, thus aiding and supporting their illegal drug business as a conspirator. Further, I believe it likely that STOCKER has provided assistance similar to that which he has provided to BOWMAN to others involved participating in the illegal sale of drugs. I believe I will find evidence, as further described in Attachment B to this affidavit, of this activity on the Target Telephone.

34.     I believe there is probable cause to search for and seize evidence, as further described in Attachment B to this affidavit, from any safe located at Coastal Print Works. In their communications, STOCKER told BOWMAN, whom STOCKER knows to be involved with the distribution of illegal drugs, that he was willing to hold onto a large

AFFIDAVIT OF RICHARD C. SCHROFF - 13

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1   amount of money for him.  STOCKER also told BOWMAN that he was willing to hold
2   onto anything, but told BOWMAN he did not want to know anything about what he was
3   holding.  Based upon the facts set forth above and my training and experience, I believe
4   STOCKER was indicating a willingness to hold narcotics for BOWMAN.  Further,
5   STOCKER claimed that he has at least $10,000 in a safe located at Coastal Print Works.
6   Based on my analysis of Coastal Print Works' and STOCKER's financial accounts which
7   show very little in cash activity, as well as STOCKER's previous communications with
8   BOWMAN, I believe it likely that these safes will contain evidence, fruits, and
9   instrumentalities of violations of 21 U.S.C. § 841(a)(1) and 846.

10      35.    I believe there is probable cause to search for and seize evidence, as further
11  described in Attachment B to this affidavit, from any safe located at Subject Residence.
12  During their June 11, 2016 meeting, STOCKER told Bowman that, "Just, if you want me
13  to hold something for you, I'll probably do it. I'll put it in my safe at home."  Based on
14  this, and the same information presented in the preceding paragraph, I believe it likely
15  that these safes will contain evidence, fruits, and instrumentalities of violations of 21
16  U.S.C. § 841(a)(1) and 846.

17                              **CONCLUSION**

18      Based on the foregoing, I believe there is probable cause that evidence, fruits, and
19  instrumentalities of violations of 21 U.S.C. § 841(a)(1) and 846, are located on the
20  Target Telephone, any safe in use by STOCKER located at Coastal Print Works, 110 E.
21  Wishkah Street, Aberdeen, Washington, and in any safe in use by STOCKER located at
22  STOCKER's residence, at 115 Florence Lane, Cosmopolis, Washington, as more fully
23  described in Attachment A to this Affidavit.  I therefore request that the court issue a
24  warrant authorizing a search of the Target Telephone, safes in use by STOCKER at
25  Coastal Print Works, and safes in use by STOCKER at STOCKER's residence for the
26  //
27  //
28  //

AFFIDAVIT OF RICHARD C. SCHROFF - 14

1    items more fully described in Attachment B hereto, incorporated herein by reference, and

2    the seizure of any such items found therein.

3         Dated this ___ day of July, 2016.

4

5

6

7         Special Agent Richard C. Schroff
          Federal Bureau of Investigation
8

9

10        Subscribed and sworn to before me this _____ day of July_, 2016.

11

12

13        The Honorable J. Richard Creatura
          United States Magistrate Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT OF RICHARD C. SCHROFF - 15

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. MJ16-5140 |
| | ) |
| Target Telephone 360-591-1088; Any safe at the Subject | ) |
| Residence; Any safe located at Coastal Print Works. | ) |
| see Attachment A for further details | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Western _____ District of _____ Washington _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached hereto and incorporated herein by this reference.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

Please see Attachment B for items to be seized, which is attached hereto and incorporated herein by this reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 2, 2016 _____
*(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Any U.S. Magistrate Judge in Western Dist. of WA _____.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      7/19/16  3:00 PM _____     _____ *Judge's signature*

City and state:   Tacoma, Washington _____      Hon. J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

2016R00334

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

    *I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: _____

_____
Executing officer's signature

_____
Printed name and title

2016R00334

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A**
**LOCATIONS TO BE SEARCHED**

1) Target Telephone: STOCKER'S cellular telephone which is currently assigned number 360-591-1088, with service provided by Verizon Wireless

2) Any safe located at the Subject Residence: 115 Florence Lane Comopolis, WA. The subject residence is more fully described as a single family home painted light brown, with white trim, and dark colored shutters and front door. The number "115" is visible on the front of the structure next to the white garage door. Subject Residence is picture below:



3) Any safe located at Coastal Print Works: 110 E. Wishkah St. Aberdeen, WA. Coastal Print Works is more fully described as a single entry store front business with "Coastal Print Works" posted in the store window, and an orange trimmed logo. The location faces to the Southeast and is located on East Wishkah Street between South I street and South Broadway Street.

ATTACHMENT A

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-380

1
2

### ATTACHMENT B
### ITEMS TO BE SEIZED

3
4
5

The items to be seized are the following items or materials that may contain evidence of the commission of, the fruits of, or property which has been used as the means of committing federal criminal violations of Title 21, Sections 841(a)(1) and 846:

6        1)   Any controlled substances;

7        2)   Drug Transaction Records:  Documents such as ledgers, receipts, notes,
8              communications, and similar items relating to the acquisition, transportation,
9              and distribution of controlled substances;

10       3)   Customer and Supplier Information:   Items identifying drug customers and
11              drug suppliers, such as, telephone records, personal address books,
12              correspondence, diaries, calendars, notes with phone numbers and names,
13              "pay/owe sheets" with drug amounts and prices, and similar items;

14       4)   Cash and Financial Records:   Currency and financial records that show
15              income from drug trafficking, including bank records, safe deposit box records
16              and keys, credit card records, bills, receipts, tax returns, vehicle documents,
17              and similar items; and other records that show income and expenditures, net
18              worth including receipts for personal property, negotiable instruments, bank
19              drafts, cashier's checks, and similar items; ·

20       5)   Photographs:  Photographs, video tapes, digital cameras, and similar items
21              depicting the property occupants, suspected buyers or sellers of controlled
22              substances, firearms, controlled substances, drug distribution paraphernalia,
23              and assets derived from the distribution of controlled substances;

24       6)   All data included in the memory of the Target Telephone which may tend to
25              show the identity, location, purpose, plan or knowledge of any person,
26              organization or association involved with drug trafficking activities, including,
27              but not limited to, telephone directories, address books, e-mails, text messages,

28

ATTACHMENT B - 1

1   voice mail, electronic correspondence, evidence of recent mobile phone calls

2   or text messages and other electronic data or records.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT B - 2